IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**ALBERT CRAMER,**                          §
                                            §
        Plaintiff,              §
                                            §
v.                                          §    Civil Action No. **3:10-CV-1428-L**
                                            §
**NEC CORPORATION OF AMERICA**               §
                                            §
        Defendant.              §

## MEMORANDUM OPINION AND ORDER

Before the court are Defendant NEC Corporation of America's Motion for Summary Judgment, filed June 17, 2011, and Defendant NEC Corporation of America's Motion to Strike Evidence Cited in Plaintiff's Brief in Support of His Response to Motion for Summary Judgment, filed July 29, 2011. After carefully considering the motions, responses, replies, appendices, and applicable law, the court **grants** Defendant NEC Corporation of America's Motion for Summary Judgment and **denies as moot** Defendant NEC Corporation of America's Motion to Strike Evidence Cited in Plaintiff's Brief in Support of His Response to Motion for Summary Judgment.

### I.     Factual and Procedural Background

On July 20, 2010, Albert Cramer ("Cramer" or "Plaintiff") filed his Original Complaint (the "Complaint") against NEC Corporation of America ("NEC" or "Defendant") and RedRiver Systems, L.L.C. ("RedRiver"). Cramer contends that NEC and RedRiver discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et. seq.* On June 13, 2011, this court issued a Memorandum Opinion and Order and held that no genuine disputes of material fact existed as to Plaintiff's claim under the ADEA against

RedRiver and dismissed with prejudice Plaintiff's claim for violation of the ADEA with respect to RedRiver.  NEC is the only remaining defendant in this action.

The court sets forth those facts for which there is no dispute.  Cramer began working with 7-Eleven, Inc. ("7-Eleven") through a contract position with another company in October 1998. Cramer was hired for the position of 7-Eleven's War Room manager as an independent contractor in October 1999.  Cramer continued as War Room manager until January 2010.  The War Room provided organizational and technical support for subcontractors (also referred to as "technicians") installing or removing hardware and software at 7-Eleven's stores and was responsible for documenting these activities.   As War Room manager, Cramer's main responsibility was to lead teams and oversee 7-Eleven's projects to ensure that they were completed in a timely manner.  Kevin Zvolanek ("Zvolanek") was one of the technicians that the War Room called on to help the War Room with issues.

NEC, among other things, provides technical, professional services to clients.  In 2009, NEC began negotiating with 7-Eleven for NEC to take over the functions performed by 7-Eleven's War Room and other functions that were performed by other 7-Eleven subcontractors. Christopher Merryman ("Merryman"), a Project Manager for NEC, participated in the negotiations of the Unites States and Canadian New Stores/Closed Stores contract ("Contract") with 7-Eleven.   Richard Shaver ("Shaver") is 7-Eleven's Information Technology ("IT") Manager and participated in the negotiations with NEC concerning the Contract.  The Contract encompassed the War Room's functions and other functions.  Under the Contract, NEC would be responsible for staging hardware, installing hardware, procuring hardware, and supporting these services from a technical and operational perspective.  The Contract also encompassed project managing and reporting to 7-Eleven with respect to these services.  The staging and installation

of hardware typically would occur at 7-Eleven stores across the United States and in Canada through the assistance of subcontractors at these locations.

During the negotiations between NEC and 7-Eleven, NEC determined that, going forward, the new department performing the War Room's prior functions would be more self-sufficient to improve efficiency and not use as many vendors to resolve issues. NEC called this new department the Deployment Support Team ("DST").

Although the Contract did not go into effect until January 1, 2010, and was not signed until December 2009, NEC began preparing to perform the Contract by selecting individuals to staff the DST. NEC began looking for a DST manager. Merryman considered Cramer and Zvolanek for the DST manager position. Merryman did not conduct formal interviews with either Cramer or Zvolanek for the DST manager position. Merryman relied on his prior experience and interactions with both Cramer and Zvolanek and knowledge of Cramer's and Zvolanek's abilities through these interactions to assess both of these individuals for the position.

During part of the time when Cramer was 7-Eleven's War Room manager, Merryman was employed by Hewlett Packard ("HP"), which was a 7-Eleven vendor. For approximately two to three years, through his employment with HP, Merryman was present in the War Room at least once or twice a week. Merryman had interacted with Zvolanek when Zvolanek was employed by Affiliated Computer Services, Inc. ("ACS") and performed services for 7-Eleven, and when Zvolanek contracted with NEC to provide services to another NEC client. When Merryman worked for HP and was assigned to a contract providing services to 7-Eleven, Merryman developed a working relationship with Zvolanek because Zvolanek worked at ACS's production support help desk, which supported 7-Eleven.

Around October or November 2009, Merryman made the decision as to whom to select as DST Manager.  Merryman selected Zvolanek to fill the DST manager position.  NEC states it did not select Cramer for the position "because it appeared to [Merryman] that Cramer did not have the technical or managerial abilities required to perform the position and that Cramer had not always satisfactorily performed services for 7-Eleven in the past."  Def.'s App. at 100. Merryman verbally advised Matthew Worley ("Worley"), Director of Client Services for NEC and Merryman's direct supervisor, that Merryman believed that Zvolanek should be selected for the DST manager position.  Worley signed off on Merryman's recommendation, and Zvolanek was offered the DST manager position, which Zvolanek accepted.  At the time of the decision to award Zvolanek the DST manager position, Cramer was 64 years old, and Zvolanek was 27 years old.

## II.     Legal Standard for Motion for Summary Judgment

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a

motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### III.    Analysis

Defendant moves for summary judgment on Plaintiff's only claim—failure to hire under the ADEA.  Plaintiff contends he was not hired for the DST manager position because of his age. Plaintiff asserts that NEC's alleged reasons for not hiring him are pretextual and that he was clearly better qualified than the selected DST manager.  Defendant asserts it has legitimate, nondiscriminatory reasons for not selecting Plaintiff for the DST manager position and that Plaintiff is unable to show that "but-for" his age, he would have been selected for the position.

### A.  Legal Standard Under the ADEA

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  "A plaintiff can demonstrate age discrimination in two ways, either through: direct evidence or by an indirect or inferential [circumstantial] method of proof." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)).  To establish a *prima facie* case of age discrimination for failure to hire based on circumstantial evidence, a plaintiff must show that: (1) he was over the age of forty at the time he was not selected; (2) he was qualified for the position; (3) he was not selected; and (4) the job remained open or was filled by someone younger. *See Lindsey v. Prive Corp.*, 987 F.2d 324, 326-327 (5th Cir. 1993); *Haas v. Advo Sys., Inc.,* 168 F.3d 732, 733 (5th Cir. 1999) (citation omitted) (setting forth a *prima facie* case under the ADEA for failure to hire). Once a plaintiff establishes a *prima facie* case, the defendant must set forth a legitimate, nondiscriminatory reason for the employment action it took against the plaintiff. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). This is a burden of production, not

persuasion, on the defendant's part, and it "can involve no credibility assessment."   *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  If the defendant meets this burden, the plaintiff must establish that the employment action occurred because of intentional age discrimination. *Machinchick*, 398 F.3d at 350.  This means that a plaintiff bringing a claim under the ADEA must prove "that age was the 'but-for' cause of the challenged employer decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (quoting *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009)).

### B.  Legitimate, Nondiscriminatory Reasons

Although the parties dispute whether Cramer was qualified for the DST manager position, the court will assume without deciding that Cramer has established a *prima facie* case of age discrimination under the ADEA.  The burden then shifts to NEC to set forth a legitimate, nondiscriminatory reason for the employment action challenged by Cramer.  NEC presents evidence that during the negotiations between NEC and 7-Eleven regarding the Contract, it was discussed that the DST would be more self-sufficient than the War Room had been and resolve most issues internally without having to frequently use vendors.  Def.'s App. at 50, 99.  NEC states that the DST manager needed to be able to "provide technical support to the subcontractors at the 7-Eleven stores staging and installing hardware and other subcontractors and 7-Eleven employees in need of technical assistance and be able to resolve any technical issues, only resorting to assistance from vendors on rare occasions."  Def.'s App. at 100.  NEC asserts it did not select Cramer for the DST manager position "because it appeared . . . that Cramer did not have the technical or managerial abilities required to perform the position and that Cramer had not always satisfactorily performed services for 7-Eleven in the past."  Def.'s App. at 100. Defendant presents evidence that, at times, Cramer would argue with 7-Eleven employees; refuse

to listen to suggestions from vendors about how to resolve technical issues; and attempt to solve technical issues and fail to solve those issues. Def.'s App. at 98. The court has carefully reviewed the evidence and determines that Defendant has articulated legitimate, nondiscriminatory reasons for not hiring Cramer for the position of DST manager. Defendant's burden is not a heavy one, and it has met it in this case.

### C.  Intentional Age Discrimination

Because the court has found that Defendant articulated legitimate, nondiscriminatory reasons for not selecting Cramer for the position of DST manager, it next considers whether Cramer has established a genuine dispute of material fact as to whether Defendant intentionally discriminated against him because of his age. In determining whether a discrimination plaintiff's rebuttal precludes summary judgment, the question is whether the plaintiff has shown that there is a genuine dispute of material fact as to whether the reasons were pretextual. *Moss*, 610 F.3d at 922. "A plaintiff may show pretext 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "A showing that the unsuccessful employee was clearly better qualified (as opposed to merely better or as qualified) than the employee[] who [was] selected will be sufficient to prove that the employer's proffered reasons are pretextual." *Id.* (citation omitted).

Defendant contends that Plaintiff cannot show that age was the "but-for" cause of its decision not to select him as the DST manager. Plaintiff responds that he has submitted compelling summary judgment evidence that creates a genuine dispute of material fact as to whether he was clearly better qualified than Zvolanek and whether Defendant's proffered reasons for not hiring him are unworthy of credence.

### 1.   Clearly Better Qualified

To show that he was "clearly better qualified" than Zvolanek, Cramer must present evidence from which a jury could conclude that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Moss*, 610 F.3d at 923 (citation omitted). "Unless the qualifications are so widely disparate that no reasonable employer would have made the same decision, any differences in qualifications are generally not probative evidence of discrimination." *Id.* (citation omitted). Thus, "the bar is set high for this kind of evidence." *Id.*

Cramer contends that he was clearly better qualified than Zvolanek for the DST manager position based on his "overall management experience." Cramer asserts he had been a manager in some capacity for over thirty years and that Zvolanek had no management experience. NEC responds that it was focused on finding a DST manager who could provide technical support to subcontractors, only resorting to vendors on rare occasions, and that the evidence demonstrates that Plaintiff's technical abilities did not make him clearly better qualified than Zvolanek.

NEC presents evidence that it did not select Cramer for the position because it appeared that "Cramer did not have the *technical or managerial abilities required to perform the position* and that Cramer had not always satisfactorily performed services for 7-Eleven in the past." Def.'s App. at 100 (emphasis added). NEC also provides evidence that the DST manager needed to be able to, among other things, "*provide technical support* to the subcontractors at the 7-Eleven stores staging and installing hardware and other subcontractors and 7-Eleven employees in need of technical assistance and be able to *resolve any issues, only resorting to assistance from vendors on rare occasions.*" *Id.* The court determines, as further explained herein, that technical and managerial abilities were requirements for the DST manager position.

Cramer contends that "Zvolanek's zero years as a manager and zero years as the War Room manager versus [his] thirty years as a manager and ten years as the War Room manager makes this comparison a 'no contest.'" Resp. at 22. The court notes that Zvolanek did have management experience, albeit not as extensive as Cramer's management experience. As indicated by his resume, Zvolanek managed ten to twelve technicians for approximately a year while working for Affiliated Computer Services, Inc. Pl.'s App. at 46. "An attempt [by a discrimination plaintiff] to equate years served with superior qualifications is unpersuasive." *Moss*, 610 F.3d at 923 (citation omitted). "Obviously, work experience is one component of defining who is more qualified, but greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another." *Id.* (citation omitted). The evidence demonstrates that Cramer undoubtedly has more management experience. Cramer's lengthier tenure of experience overall, however, does not necessarily demonstrate superior qualifications.

Moreover, managerial ability is only part of the equation; Cramer has not demonstrated that he was clearly better qualified to perform the technical requirements of the DST manager position. Cramer notes that to the extent NEC argues that it desired someone more "technical" for the position, the job description[*] for the position contains no reference to computer technical

---

[*] Plaintiff asserts that the job description for the DST manager position does not require technical computer capabilities. Defendant objects to the job description proffered by Plaintiff and alleged to be the job description for the position at issue (Exhibit 33, Pl.'s App. at 28) because it has not been authenticated as required by Federal Rule of Evidence 901. Def.'s Mot. to Strike at 5. Specifically, Defendant asserts that Plaintiff has not presented evidence that the job description (Exhibit 33) is the DST manager job description. Plaintiff presents evidence that Merryman testified that he could not recall whether Exhibit 33 is the job description for the DST manager position. Pl.'s App. at 25-27. Merryman testified that "it could be" the DST manager job description. Plaintiff asserts that the court can assume that Exhibit 33 is the job description for the DST manager position because it was produced during discovery and Plaintiff only requested that NEC produce a job description for the DST manager position. Although not provided in its appendix, Defendant represents to the court that Plaintiff's Request for Production No. 37 requested "any and all documents which concern or relate to the positions listed in Interrogatory Nos. 1 and 4 of Plaintiff's First Set of Interrogatories to NEC Corporation of America." Def.'s Reply in Supp. of Mot. to Strike at 7. Defendant also represents that Plaintiff's Interrogatory No. 4 requested information concerning "any and all positions on the Deployment Support Team for 7-Eleven." *Id.* Based on these representations, the court determines

abilities.   The court, however, finds that the record supports the conclusion that technical abilities, such that the DST would be self-sufficient, were essential requirements of the DST manager position.   Shaver testified that the DST was to be self-sufficient and able to function without having to resort to outside vendors to resolve issues.   Def.'s App. at 50.   Shaver further testified that a self-sufficient DST was the "mutually-agreed-upon goal" and that the parties to the Contract agreed it would be an "improvement if [they] didn't have to impact the processes by escalation to other entities."   Def.'s App. at 51.   Merryman stated in his affidavit that NEC determined that the DST would need to be managed and staffed with individuals with high technical capabilities so that the DST could solve most issues internally and not use vendors as frequently as the War Room had.   Def.'s App. at 99.   Shaver also testified that, in comparison to the operation of the War Room, the DST makes fewer calls to outside vendors, and the DST has "a much further in-depth knowledge of the system to be able to deal with [] problems."   Def.'s App. at 48.   Shaver further testified that the functions performed by the DST are at a different level ("much more self-sufficient") than those performed by the prior War Room, managed by Cramer.   Def.'s App. at 53.   Accordingly, the record also supports the conclusion that the technical requirements for operating the DST are to some extent different than those for operating the War Room because the DST is more self-sufficient.   *See id.*   Thus, Cramer's lengthier tenure of experience as War Room manager does not necessarily demonstrate superior qualifications.

"[T]he fact that a candidate's experience is recent and specialized in relation to the job at issue is a consideration relevant to qualification, in addition to simple length of experience."

---

that Plaintiff requested documents concerning all positions on the DST, not just the DST manager position.  As the testimony of Merryman provided in Plaintiff's appendix provides insufficient information to support a finding that Exhibit 33 is the DST manager job description, the court cannot conclude that it is the job description for the DST manager position.

*Moss*, 610 F.3d at 923.   Although NEC failed to cite to this evidence in its brief, the court's own review of the summary judgment evidence shows that Zvolanek had more extensive technical abilities than Cramer.   Shaver, as IT Manager for 7-Eleven for approximately 15 years, worked with Cramer on a day-to-day basis while Cramer held the position of War Room manager. Def.'s App. at 44-45.   Shaver served as Cramer's manager at 7-Eleven.   Def.'s App. at 65. Shaver testified that there is a production support skillset and product support skillset.   Def.'s App. at 45.   The former requires in-depth knowledge of the making of the product and the ability to troubleshoot at all levels.   *Id.*   The latter requires an awareness of the product and what it should do and the ability to develop some troubleshooting processes.   *Id.*   Shaver testified that Cramer did not have the production support skillset. Def.'s App. at 45-46.   Shaver testified that Zvolanek has production support technical level expertise. Def.'s App. at 53.   Further, Shaver testified that Zvolanek, based on his observations, appeared to have a higher technical skillset than Cramer.   Def.'s App. at 55.   Shaver also testified that if an issue arose that had been encountered before and was part of the decision tree, Cramer could troubleshoot it to resolution; however, if a new issue did not follow the decision tree or the documents accessible within the War Room, Cramer did not have the skillset to troubleshoot it to resolution and would have to seek out production support.   Def.'s App. at 47.   Merryman stated he witnessed Plaintiff "attempt to solve technical issues, fail to solve the issues—including failing to troubleshoot hardware and software technical issues to resolution—and then call vendors for help."   Def.'s App. at 98. Zvolanek was one of the individuals that the War Room called upon to assist with technical issues when Cramer was the War Room manager.   Def.'s  App. at 19.  Zvolanek spent at least four years obtaining experience with 7-Eleven's software and hardware.   Def.'s App. at 70, Pl.'s App. at 46.

As previously determined by the court, technical abilities comprised an essential requirement of the DST manager position.  Cramer provides evidence that he engaged in computer technical activities as the War Room manager, but he has not demonstrated that his technical abilities make him clearly better qualified for the DST manager position than Zvolanek.  Cramer has not met the high bar of showing that no reasonable person, in the exercise of impartial judgment, could have chosen Zvolanek over Cramer for the job in question.

## 2.  False or Unworthy of Credence

The court next considers whether Plaintiff has raised a genuine dispute of material fact that NEC's proffered reasons for not selected him were false or unworthy of credence.  NEC has asserted three reasons for not selecting Cramer for the DST manager position: (1) lack of technical abilities; (2) lack of managerial abilities; and (3) failure to always satisfactorily perform services for 7-Eleven in the past.  *See* Def.'s App. at 100.  Cramer "must put forward evidence rebutting each of the nondiscriminatory reasons [NEC] articulates."  *Vaughn v. Woodforest Bank*, __ F.3d__, 2011 WL 6382033, at *4 (5th Cir. Dec. 21, 2011) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).  NEC is allowed to be incorrect in its assessment of the facts it relies on to justify not selecting Cramer, but it is not allowed to have any discriminatory animus against him in making its decision.  *Id.*  For the reasons that follow, Plaintiff fails to put forth evidence sufficient to rebut *each* of the reasons articulated by NEC.

### a.  Lack of Technical Abilities Reason

The court first examines the "lack of technical abilities" reason.  Cramer first states that the failure to list any technical capability requirements in the job description for the DST manager position is fatal to NEC's alleged reasons for not selecting Cramer for the position.  As previously determined by the court, Cramer has not established that the job description to which

he refers is the job description for the DST manager position.  Thus, the court cannot draw any conclusions from the alleged exclusion of technical capability requirements in the job description document proffered by Plaintiff.  Moreover, the court has also determined that the overwhelming evidence in the record supports the conclusion that technical abilities were essential requirements of the DST manager position.  Accordingly, the court finds that the proffered job description and the alleged exclusion of technical capability requirements therein do not provide evidence of pretext.

Cramer next draws the court's attention to the language used by NEC in expressing its reasons for not selecting Cramer.  Plaintiff contends that Merryman's assertion that it "*appeared . . . that Cramer did not have the technical or managerial abilities required to perform the position*" shows that NEC and Merryman did not know for sure at the time the decision was made whether Cramer had the technical abilities needed for the position.  Defendant responds that predicating its decision on its beliefs regarding Cramer's competence does demonstrate that discrimination occurred.  The court agrees.  The proper inquiry is "whether [NEC's] *perception* of [Cramer's] performance, accurate or not, was the real reason" for its decision.  *Laxton*, 333 F.3d at 579 (quoting *Shackelford v. DeLoitte & Touche*, LLP, 190 F.3d 398, 408-409 (5th Cir. 1999) (emphasis in *Shackelford*).  The law is well-settled that:

> [E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence.  Motive is the issue.
>
> . . . [A] dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.

*Little v. Republic Refining Co*., 924 F.2d 93, 97 (5th Cir. 1991) (internal citation omitted).

Cramer also argues that considering Merryman's uncertainty of Cramer's technical abilities, the failure of Merryman to talk with or interview Cramer to determine the level of his technical abilities and Merryman's assumption that Cramer did not have such capabilities is suspicious.  Cramer also states that his time in War Room with Merryman was limited, and Merryman's failure to observe him performing technical issues does not mean Cramer did not perform such technical issues.  Cramer's arguments are unavailing.  Cramer testified that Merryman was present in the War Room at the time Cramer was War Room manager "at least once or twice a week, sometimes more" for approximately two to three years.  Def.'s App. at 35. Cramer further testified that Merryman had the opportunity to view his management style and abilities and assess those through his time spent in the War Room.  *Id.*  Merryman stated in his affidavit that he did not conduct formal interviews of either Cramer or Zvolanek for the DST manager position; rather, Merryman relied on his prior experience and interactions with both Cramer and Zvolanek and his knowledge of their abilities through these interactions to assess both of them for the DST manager position.  Def.'s App. at 100.  The evidence shows that Merryman did not make a baseless assumption regarding Cramer's competence but formed good faith beliefs as to Cramer's competence based upon his observations while in the War Room. With respect to Merryman's failure to interview Cramer, the evidence demonstrates that Merryman treated both Zvolanek and Cramer the same in this regard and did not interview either person for the position.  Accordingly, the court determines that Merryman's failure to interview or talk with Cramer and his alleged incorrect assumption or assessment regarding Cramer's abilities do not demonstrate pretext.

Cramer next argues that he did have the technical capabilities to perform the DST manager position and that this is evidence of pretext. NEC counters that Cramer's disagreement with its assessment of his technical abilities does not demonstrate pretext.

There were regular, hourly workers in the War Room that Cramer managed and specialists from outside vendors, such as ACS, HP, and NCR, that also performed services for 7-Eleven. Pl.'s App. at 6. Cramer presents evidence that the specialists from ACS, HP, and NCR did not necessarily have skillsets that he and the individuals he managed in the War Room did not also have. Pl.'s App. at 6. Cramer testified that he and the individuals he managed "could do a lot of things" that the specialists from ACS, HP, and NCR were doing. Pl.'s App. at 6-7. Cramer also testified that he "was the big picture guy," but he also "got [his] hands wet and [] did a lot of the other things, also." Pl.'s App. at 11-12.

Shaver testified that during the time that Cramer managed the War Room, Cramer called on vendors and other support teams to resolve issues. Def.'s App. at 47. Cramer testified, for example, that he called on Zvolanek once in a while to help the War Room with some issues. Def.'s App. at 19. Merryman stated in his affidavit that he witnessed Cramer attempt to solve technical issues, fail to solve those issues, and then call vendors for help. Def.'s App. at 98. Shaver testified that if a new issue arose that did not follow the decision tree or the documents accessible within the War Room, Cramer would have to seek out production support expertise. Def.'s App. at 47. The evidence, viewed in the light most favorable to Cramer, demonstrates that he used vendors at times to perform the work of the War Room and did not have the ability to troubleshoot all issues to resolution. This evidence, however, does not demonstrate that Merryman's assessment that Cramer lacked the technical abilities to perform the DST manager

position, based upon his observations of Cramer failing to troubleshoot certain issues and calling on vendors for assistance, was false or unworthy or credence as required by the ADEA.

Even if Merryman's assessment was incorrect, Cramer still has not demonstrated that Merryman's assessment constitutes pretext.  "The [pretext] inquiry is focused on whether [NEC's] explanation, accurate or not, is 'the real reason'" for not selecting Cramer for the DST manager position.  *Vaughn*, 2011 WL 6382033, at *4 (citing *Laxton*, 333 F.3d at 579).  "Our anti-discrimination laws do not require an employer to make proper decisions, only [nondiscriminatory] ones." *LeMaire v. Louisiana*, 480 F.3d 383, 391 (5th Cir. 2007).  Cramer asserts that because he did have technical capabilities to perform the job, it "crashes" NEC's lack of technical capabilities argument.  Resp. at 16.  Assuming *arguendo* that Cramer had the technical abilities to perform the job, the court finds that this demonstrates at most that Merryman's assessment was incorrect.  As the court previously established, NEC is allowed to be incorrect in its assessment of the facts it relies on to justify not selecting Cramer, but it is not allowed to have any discriminatory animus against him in making its decision.  *Vaughn*, 2011 WL 6382033, at *4.  "[Cramer] must do more than just dispute the underlying facts and argue that [NEC] made the wrong decision in order to survive summary judgment." *LeMaire*, 480 F.3d at 391.

Finally, Cramer asserts that two comments made by Merryman demonstrate pretext.  First, Cramer contends that Merryman made a false statement to Shaver when he stated that he spoke to Cramer about the DST manager position.  Shaver testified that he spoke with Merryman around September or October 2009 about three persons to consider for the DST manager position: Moore, Kremer, and Cramer.  Pl.'s App. at 33, 34.  Shaver testified that he would "tag up" with Merryman, and he (Merryman) would state that he would meet with the three

individuals "next week" or the "week after that."  Pl.'s App. at 34.  Shaver testified that

Merryman finally stated, sometime before the beginning of the year (2010), that he met with

them, and Shaver did not hear any details regarding the meeting with Cramer and has no idea

what was discussed or the outcome.  *Id.*   Merryman testified that he did not speak with Cramer

regarding the DST manager position.  Def.'s App. at 86.  Merryman stated in his affidavit that he

did not conduct formal interviews with either Cramer or Zvolanek; rather, he relied on his prior

experience and interactions with both Cramer and Zvolanek and his knowledge of their abilities

through these interactions to assess both of these individuals.  Def.'s App. at 100.

Regarding the second comment, Cramer states in his affidavit that in December 2009,

Merryman met with him in the break room at 7-Eleven and told him that he was not getting the

DST manager position.  Pl.'s App. at 52.  Cramer states that Merryman informed him that the

decision was not his, but Worley's.  *Id.*  Cramer also states that Merryman told him that "if it

were up to him he would have hired [Cramer] in a minute because he knew [Cramer], he knew

how [Cramer] worked, and how successful [Cramer] was managing the 7-Eleven War Room."

*Id.*

The court determines that these statements do not provide evidence that NEC's stated

reasons for not selecting Cramer for the DST manager position are false or that Merryman made

the decision to not select Cramer because of Cramer's age.  At most, these statements create only

a weak dispute of fact as to whether NEC's reasons are untrue.  *See Reeves,* 530 U.S. at 148

(holding that there are instances in which a showing of pretext is insufficient to establish

discrimination: (1) when the record conclusively reveals some other, nondiscriminatory reason

for the employer's decision, or (2) when the plaintiff creates only a weak issue of fact as to

whether the employer's reason was untrue, and there was abundant and uncontroverted evidence

that no discrimination occurred.)   A decision as to whether judgment as a matter of law is appropriate ultimately turns on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id* at 148-49.   The court finds that these statements offered as evidence of pretext by Plaintiff are insufficient to demonstrate pretext in light of the uncontested evidence that Defendant made its decision based on its assessment of Plaintiff's abilities, whether accurate or not.

For the foregoing reasons, the court determines Plaintiff has not demonstrated a genuine dispute of material fact for which one may reasonably infer that the "lack of technical abilities" reason was false or unworthy of credence as required by the ADEA.

### b.  Lack of Managerial Abilities and Failure to Always Satisfactorily Perform Services for 7-Eleven in the Past Reasons

The court next considers the "lack of managerial abilities" and "failure to always satisfactorily perform services" reasons in tandem, as they are closely related.  Plaintiff asserts these reasons proffered by Defendant have no basis in fact and that Defendant emphasizes isolated incidents in which Cramer voiced displeasure with technicians and other vendors and allegedly had arguments with 7-Eleven employees.   Defendant counters that Plaintiff's arguments amount to a disagreement whether his managerial abilities were insufficient for the DST manager position and that an employer's incorrect belief as to competence does not constitute pretext.

Merryman testified that he thought Cramer was "aggressive, dedicated and persistent, but not always in a positive manner."   Def.'s App. at 74.   Merryman elaborated, "[i]t was not uncommon for Mr. Cramer to have little patience with technicians that were doing their first

**Memorandum Opinion and Order – Page 19**

services for 7-Eleven or on 7-Eleven premises."   Def.'s App. at 75.    Regarding Cramer, Merryman further testified, "[w]e also had found that there was, at times, demeaning circumstances that our technicians reported back to me, and there was overall a lack of, in my opinion, time management and escalation management or issues management . . . ."  Def.'s App. at 75.  Merryman stated in his affidavit that he "saw Cramer refuse to listen to suggestions from vendors and other individuals about how to resolve technical issues . . . [and] also witnessed Cramer frequently argue with 7-Eleven employees, causing [him] to believe that 7-Eleven was not satisfied with the services that Cramer provided to 7-Eleven."  Def.'s App. at 98.

Cramer rebuts the evidence presented by NEC by presenting evidence that Shaver and 7-Eleven valued his management style as War Room manager.  Shaver testified:

> There may have been occasions where they—people would claim [Cramer] was pushy, but it was pushy on our behalf.
>
> And on our behalf, [Cramer] was just like a watchdog.  He was very good at what he did to drive things to fruition and get things done, and we really were pleased with [Cramer].  Even though people may have said, "well, [Cramer] was a little assertive on this," but he was assertive and got the job done.  And he's been recognized for getting the job done.

Pl.'s App. at 38-39.  Plaintiff argues his "pushing" and "aggressiveness" were the key factors that made him such a success as the War Room manager.

Consistent with Merryman's observations, Shaver testified that Cramer had an aggressive management style.  Pl.'s App. at 39.  Shaver further testified that Cramer's management style was sometimes termed as "pushy."  Id.  Shaver, however, found this style suitable.  Id.  Cramer testified that sometimes if he had started on a course of action, he would not consider suggestions from others.  Def.'s App. at 24.  Cramer stated that if he and his team started on one course of action, they would stay on that course of action until it either passed or failed.  Id.  Cramer testified that he "butted heads with people that [he] didn't feel had the answers."  Def.'s

App. at 32.  "[He] didn't butt heads with people who did have the answers."  *Id.*  Cramer testified that individuals complained that it took too long for the War Room to resolve issues, and that such comments from an individual named Kelli Hanson were "moderately frequent" and such comments from Richard Shaver occurred "once in a while."  Def.'s App. at 20.  Cramer testified that Merryman had the opportunity to view his management style and abilities and assess those through his time spent in the War Room.  Def.'s App. at 35.  Cramer agreed that some people could possibly prefer different management styles than others.  Def.'s App. at 36.

Having reviewed the full record, the court determines Merryman's observations are supported by the record.  The record, at most, demonstrates that Shaver and Merryman disagreed as to Cramer's management abilities and that Merryman was incorrect as to whether 7-Eleven was always satisfied with Cramer's services.  The court previously stated that NEC is allowed to be incorrect in its assessment of the facts it relies on to justify not selecting Cramer, but it is not allowed to have any discriminatory animus against him in making its decision.  A court "should not substitute [its] judgment of an employee's qualifications for the employer's in the absence of proof that the employer's nondiscriminatory reasons are not genuine."  *EEOC v. Louisiana Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995).  Plaintiff has not demonstrated that Merryman's perception of his managerial abilities and performance of services for 7-Eleven in the past, accurate or not, was not the real reason for his decision to not select Cramer for the DST manager position.   Accordingly, Cramer has failed to create a genuine dispute of material fact from which one may reasonably infer that the "lack of managerial abilities" and "failure to always satisfactorily perform services" reasons are false or unworthy of credence.

IV.    **Defendant's Motion to Strike Plaintiff's Evidence**

NEC filed Defendant NEC Corporation of America's Motion to Strike Evidence Cited in Plaintiff's Brief in Support of His Response to Motion for Summary Judgment on July 29, 2011. The court reviewed the motion, response, and reply, and ruled on certain evidentiary objections in this opinion as the evidence was presented in the summary judgment briefing.  The court considered as evidence those portions of the Amended Declaration of Albert Cramer that constituted competent summary judgment evidence, as it was filed pursuant to this court's order of August 25, 2011.  To the extent the court has not explicitly ruled on NEC's objections to Plaintiff's evidence, the court overrules such objections and denies NEC's motion as moot, as it has only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure and the summary judgment standard herein enunciated.

V.    **Conclusion**

For the reasons herein stated, the court **concludes** that Cramer has failed to raise a genuine dispute of material fact that age was the "but-for" cause of NEC's decision not to hire him for the DST manager position.  Accordingly, NEC is entitled to judgment as a matter of law, and the court **grants** Defendant NEC Corporation of America's Motion for Summary Judgment. The court **denies as moot** Defendant NEC Corporation of America's Motion to Strike Evidence Cited in Plaintiff's Brief in Support of His Response to Motion For Summary Judgment to the extent herein stated.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the court will issue judgment by separate document.

**It is so ordered** this 3rd day of February, 2012.

Sam A. Lindsay
United States District Judge